[No. 22273. Department One. April 21, 1930.]

A. OHLSON, *Respondent*, v. JOHN SAWBRIDGE, *Appellant*.[1]

*McAulay & Freece* and *H. J. Snively*, for appellant.
*Richards, Gilbert* and *Conklin*, for respondent.

[1]Reported in 287 Pac. 206.

Tolman, J.—This is an action based upon a claim for money loaned. Trial was had to a jury, which returned a verdict in plaintiff's favor for $5,000 with legal interest from August 11, 1925. The defendant has appealed from a judgment entered on the verdict.

To understand the various assignments of error which must be discussed, a brief and concise statement of the somewhat involved situation disclosed by the evidence must be attempted. Upon all the material points, the evidence was in sharp conflict; but the facts as here stated are about what the jury must have believed.

In December, 1924, the United Mines, Ltd., a British Columbia corporation, held under bond certain mining properties near Ainsworth, British Columbia, $54,000 of the purchase price being unpaid and maturing in installments. The company had other indebtedness approximating $3,000 and was desirous, by the sale of its stock, of raising money to meet the payments on the bond, to pay its indebtedness and to provide a fund for developing its mining properties. Accordingly, on December 15, 1924, by a written agreement of that date, it granted to appellant Sawbridge an option to purchase 1,100,000 shares of its capital stock at five cents per share, with certain conditions as to the amount to be taken and paid for each month; the option, of course, to terminate if any of the conditions were unmet. In January, following, Sawbridge entered into an agreement with I. H. Dills and Martin Olsen whereby he assigned to each of them a one-third interest in the option just mentioned, making them each equally interested therein with him.

Thereafter, some time in the spring of that year, Sawbridge and his associates got in touch with the respondent and attempted to sell him some of the stock which they had under option. In June, respond-

ent, with Martin Olsen, went to the mine for the purpose of inspection. At that time the mine was flooded and very little, if any, of the underground workings could be seen. So far as inspection could be made, respondent seemed to be pleased with what he saw; and he conceived the idea that the proper way to work the mine was to install electric power, and, as he had had experience along that line, he made suggestions and gave advice with respect thereto. On this trip respondent learned of the option agreement held by Sawbridge and his associates, and it was suggested to him that he might be given an interest therein.

Later on in July the parties mentioned met in Yakima and discussed the affairs of the mine at length and in detail; Ohlson refusing at that time to buy stock at 10c per share, and insisting that, before he would buy any stock or put any money into the enterprise, five conditions must be met: (1) That the mine be unwatered and he be permitted to make a thorough examination; (2) that he be elected secretary and assistant manager of the mining company; (3) that he be given opportunity to examine the books of the company; (4) that an extension of one year's time be obtained upon the payments falling due under the bond; and (5) that the company should agree to install electric power and that respondent be employed to have charge of that work at a salary of $300 per month. At this same conference, the option on the stock was discussed and inquiry was made of respondent as to how much stock he thought he could sell to others. He suggested that, if everything was found satisfactory, he might be able to interest others to the extent of $20,-000 to $25,000. Apparently, with the hope of obtaining the aid of respondent's efforts in selling the optioned stock, the contract theretofore existing between Sawbridge, Dills and Martin Olsen, or the three-party con-

tract, was re-drawn and made a four-party contract by which respondent was made equally interested in the option agreement with Sawbridge, Dills and Martin Olsen, each having a one-fourth interest therein. This contract was duly executed by the parties thereto, and is in evidence. It binds respondent to nothing whatever except:

"For and in consideration of the above transfer and assignment, the said parties of the second part, and each of them, do hereby agree to use their best skill and efforts to sell the said stock in said option agreement described as rapidly as can be done with the exercise of reasonable diligence and effort, it being understood, however, that none of said stock shall be sold for less than ten (10) cents per share."

Respondent testified that it was his intention, if, after a complete examination of the mine and the books, everything was found satisfactory, and after all of his conditions had been complied with, to invest $5,000 in the enterprise. Appellant undoubtedly knew that respondent was interested and expected him to invest $5,000, but perhaps hoped that the conditions or most of them would be waived.

Early in August, following this Yakima conference, the interested parties agreed to meet in Spokane, where it was understood that the books of the company would be placed at respondent's disposition for examination, and that from Spokane they would all go on to visit the mine. According to these arrangements, respondent went to Spokane, but appellant did not keep the appointment, having gone into Idaho and left word that he would join the party on its way to the mine. Respondent inquired for the books, but was put off with the excuse that they were in the hands of an auditor and not available, and the secretary of the company testified on the trial that he was directed by

appellant to avoid producing the books for examination, if possible. The party went on to Nelson, British Columbia, being joined on the way by appellant. At the hotel in Nelson, according to respondent's testimony, he was called aside by appellant and it was explained to him that there was a payment of $7,000 due on the bond which must be met at ten o'clock the next morning or the property would be lost to the company, and, according to respondent, appellant then asked him to loan to appellant $5,000 which was needed to make up the payment, and that he, appellant, would sell his ranch, if necessary, to pay the money back.

Without following in detail the story of either side as to what followed, it is sufficient to say that respondent testified that he did then make the loan to the appellant personally, and there are some things in the way of admissions by the appellant appearing in the record which tend to corroborate his story. Upon the other hand, appellant denies absolutely any request for a loan, and testified that he asked the respondent if he was ready to complete his purchase of stock in the company to the extent of $5,000, and that, in answer to that request, respondent delivered his check for that sum. There is, also, in the record evidence corroborative of appellant's version. The check so delivered by respondent was deposited in the bank to the credit of the mining company and the amount was checked out on behalf of the mining company in making a payment upon the bond.

The parties went on from Nelson to the mine at Ainsworth, and found it still flooded, at least in the lower levels, so that no complete inspection could be had. While at the mine, respondent made investigations with reference to the electrification of the mine and seems to have earnestly urged that that be undertaken.

It will thus be seen that, at the time that respondent

parted with his $5,000, none of his conditions, if any he had made, had been complied with.

After this trip to the mine, nothing further seems to have been done with a view of further interesting the respondent. A little later, certificates of stock to the extent of fifty thousand shares were sent him, which he refused to accept, and respondent seems to have done nothing to interest others or to make sales of stock, because his conditions had not been met.

The annual meeting of the mining company was held in British Columbia in September, and shortly thereafter a directors' meeting was held at Yakima. Appellant attempted to introduce the minutes of these meetings, but on objection they were ruled out. Appellant also attempted, by the oral testimony of witnesses who were present at these meetings, to establish what had been done. Objections to this testimony were also sustained. But a witness was permitted to, and did, testify that respondent was elected a director of the mining company on September 15, 1925, and that he did not accept such election and never qualified.

Respondent does not appear to have made a direct demand for repayment of the money until about October 2, 1925, but from that time on he has insisted on its repayment at all times. Much correspondence was introduced in evidence, but no letters written by respondent are necessarily out of harmony with his claim that this was a personal loan. There is also evidence of admissions upon the part of appellant which might have been very effective with the jury.

The first group of assignments of error argued has to do with the rulings of the trial court rejecting the minutes of the annual meeting of the mining company and the meeting of the directors held thereafter, and also the rejection of oral evidence as to what occurred at those meetings.

It was brought out that the annual meeting of the corporation was called for September 2, 1925, and on request of the appellant the date was changed to September 10, and the minutes offered showed that they purport to be the minutes of a meeting actually held on September 15. There was no showing of the giving of proper notice or notice of a change of date or postponement or of any attempt to comply with the by-laws of the corporation with respect to calling an annual meeting. The president of the corporation, who presided at the meeting, testified that the minutes were taken by a person, not shown to be an officer or stockholder of the company, in longhand, while the identification offered was a typewritten document, not in the regular minute book of the company and not signed by its secretary. The witness was very uncertain as to when and where the minutes were signed by him as president. The minute book of the corporation was not offered in evidence. As much or greater uncertainty was revealed in respect to the minutes of the directors' meeting held in October. As to the oral testimony of what occurred at these meetings, the trial court held that the written minutes would be the best evidence, and, until the minute book was produced or there was competent evidence that there were no written minutes, oral testimony was inadmissible.

Perhaps, if appellant had been permitted to show the action had at these meetings in either way, we would not have held it to be an abuse of discretion, but the rulings being technically right, for lack of identification and similar reasons, we certainly will not reverse the judgment on account thereof unless it appears with certainty that prejudice resulted.

We have examined the rejected minutes, and, while perhaps slightly corroborative in some respects, they go mainly to collateral issues. The purpose of these

offers, as disclosed at the time, was to show thereby that certain suggestions and requests made by the respondent, not to the appellant, but to and of Martin Olsen, the president of the corporation, had been carried out. It is not claimed that these suggestions or requests took the place of or embodied the substance of respondent's claimed conditions already mentioned, or that the minutes show any compliance with those conditions, save only the election of respondent as a director of the corporation, and that was testified to without objection. Outside of that one thing, which was not denied and needed no corroboration, the matters disclosed by the so-called minutes were largely immaterial, and so far as material, it all goes only to show that, at the time respondent made the suggestions preceding the annual meeting, he had not yet lost interest in the mining venture. There is plenty of other evidence to that same effect, and we cannot conceive of these minutes having any effect upon the minds of the jury in deciding the main issue as to what occurred between the parties more than a month before the earliest of these meetings.

The court instructed the jury as follows:

"By the preponderance of the evidence is not meant the greater number of witnesses. It is not necessarily determined by the number of witnesses testifying and you may be convinced of the truth of a given fact or state of facts by a less number of witnesses testifying thereto against a larger number testifying to the contrary. It means the greater weight of evidence and lies with that evidence which has the greater persuasive and convincing power. It creates the stronger impression of its truth when contrasted and weighed against the evidence in opposition thereto."

Appellant urges that this instruction contains the same vices as the one on the same subject construed in *Peart v. Perry*, 152 Wash. 5, 277 Pac. 81; but we think

a simple comparison shows that this instruction clearly avoids the evils pointed out in the *Perry* case. The whole subject having been so recently discussed, we will not now attempt to elaborate upon it.

In another instruction the court used the expression "advance or delivery of the money by the plaintiff to the defendant," and the appellant seizes upon the use of the word "advance" in that connection as being the equivalent of the word "loan" and hence a comment on the evidence. The court having coupled the word "advance" with the word "delivery," thus defined it for the purposes of this case, and the jury could not have been misled or prejudiced by such use of the word.

From what has already been said, it is apparent that respondent made a case for the jury and therefore the motion for judgment *n. o. v.* was properly denied.

The evidence being conflicting, the motion for a new trial was addressed to the sound discretion of the trial court and there being nothing to show an abuse of discretion, it is not our province to interfere.

Finding no prejudicial error in the record, the judgment is affirmed.

MITCHELL, C. J., PARKER, BEALS, and MILLARD, JJ., concur.